**Jack D. DUNBAR, Plaintiff,**

v.

**Joseph A. CALIFANO, Jr., Secretary of Health, Education, and Welfare, Defendant.**

**No. Civ–77–69.**

United States District Court, W. D. New York.

July 12, 1978.

Legal Counseling for the Elderly Project, Legal Aid Bureau of Buffalo, Inc. (Olney H. Clowe, Buffalo, N. Y., of counsel), for plaintiff.

Richard J. Arcara, U. S. Atty.; Buffalo, N. Y. (Theodore J. Burns, Asst. U. S. Atty., Buffalo, N. Y., of counsel), for the Government.

CURTIN, Chief Judge.

This is an action brought under 42 U.S.C. § 405(g) to review a final determination of the Secretary of Health, Education and Welfare, denying the plaintiff's application for social security disability benefits. The case is before the court on the defendant's motion for summary judgment.

On December 9, 1971, the plaintiff filed an application for social security disability benefits. On April 13, 1972, he received a notice from the agency that his application had been denied. In a notice of reconsideration dated July 1, 1974, the initial denial of the claim was affirmed. On April 29, 1975, an administrative hearing was held before an Administrative Law Judge [ALJ], who again denied the plaintiff's claim for benefits. This decision became the final decision of the agency when it was affirmed by the Appeals Council in all respects in a letter dated October 22, 1976.

The procedural history of this case reveals over six years of persistent and painstaking efforts on the part of Mr. Dunbar to establish his claim for benefits. At all stages, his efforts have been met with delays, misunderstandings, and a general lack of sensitivity by the Social Security Administration [SSA] to the realities of his individual case. His extreme frustration and disillusionment are both understandable and justified.

Mr. Dunbar claims that he became unable to work in 1970 because of severe pain caused by an arthritic condition. Because the ALJ's determination was based on his credibility, his unusually successful work history is worth recounting in some detail.

Mr. Dunbar was born in 1916, and received a Bachelor's degree in engineering.

He has worked extensively in various management and technical capacities since 1933, including the space sciences, and has completed approximately twenty in-service special courses in management and technology. At the time he was forced to leave his job in 1970, he served as Principal Scientist at Bell Aerospace in Niagara Falls, with an annual income in excess of $20,000. His professional background demonstrates that he is a highly motivated and competent individual, who has held positions of great responsibility. He worked as a metallurgical assistant from 1933 to 1938, a metallurgist and management trainee from 1938 to 1942. In 1942, he moved to Washington, D. C. to work in the Pentagon on weapons development. He worked there for ten years in the Office of Chief of Ordnance, beginning as a metallurgist, and succeeding to the positions of assistant chief engineer, chief of the engineering and inspection section, and civilian chief. From 1952 to 1957, Mr. Dunbar established and managed his own consultant business, Industrial Materials and Methods-Management Consultant. During this same time, from 1954 to 1956, he also worked as an associate director of research and development with Alloy Engineering and Steel Casting. Mr. Dunbar then took a job with General Electric, managing various laboratories and departments in the areas of nuclear power and space sciences. In 1963, he transferred to Bell Aerospace, where he established several new laboratories and directed the manufacturing engineering department.

When his physical condition began deteriorating in 1968, Bell permitted Mr. Dunbar to set up a traction device at work for use during the day, allowed him to schedule his own hours, and made other efforts to accommodate his increasingly debilitating condition. By March, 1970, his condition had become so poor that continued work was impossible. He had regularly recurring attacks of acute pain, during which time he would be confined to traction for as much as a week at a time. During the attacks, normal activity such as walking and elementary personal hygiene became virtually impossible.

Finally, on March 26, 1970, a cervical laminectomy was performed on Mr. Dunbar to correct degenerative disc disease. Although it was hoped that the surgery would result in some permanent improvement, it did not eliminate his pain. He continues to suffer constant low-level pain in every joint, with periodic attacks of great severity.

At the hearing, the plaintiff, his wife, and a vocational expert testified. Numerous medical reports were submitted into the record. Since the evidence in this case is voluminous and was well summarized in the AJL's decision, it will only be briefly summarized at this time.

Mr. Dunbar's March 1970 operation involved a surgical fusion of two joints in his spine. His attending physician during this hospitalization, Dr. A. Slepian, a neurosurgeon, reports that the surgery was a medical success because the disc disease was eliminated. However, the plaintiff claims that the disc operation did not eliminate his pain, and that his disabling condition is not limited to disc disease but consists of a more general arthritic condition.

The plaintiff submitted numerous medical reports from his regular physician, Dr. Taylor. He states that the plaintiff has had little benefit from his surgery and should be considered to be 100% disabled.

The record contains various other medical reports and statements from both examining and nonexamining physicians. In short, these reports indicate that the plaintiff has had a long history of varied musculoskeletal discomfort which particularly involved his neck, low back, left knee, and upper extremities. Although the physicians disagree as to the extent of the plaintiff's physical impairment, they all agree that at least some impairment exists which could partially explain the pain. None, however, are as favorable to the plaintiff as Dr. Taylor.

The plaintiff testified that he suffers constant, low-level arthritic pain in every joint with periodic severity. He stated that it is constant in his lower back, neck, left elbow, and left hip. It affects his other joints periodically. He testified that he takes twenty-five to forty pills a day depending on whether his condition is good or acute. On some days, his lower back pain immobilizes him. On better days, he can walk, but only with a limp. He needs two hands to raise a cup of coffee and to comb his hair because his hands tremble at all times. He can drive, but only for short periods of time.

This testimony was substantiated by Mr. Dunbar's wife. The only other witness at the hearing, the vocational expert, testified that the plaintiff could not be employed in any position if his allegations of pain and of functional restrictions were accepted as true.

The plaintiff's efforts to continue working after his operation, followed by his protracted efforts to establish disability, are worthy of note. The plaintiff testified while he was recovering from the cervical surgery performed in 1970, he was still hopeful of returning to work. Because he had five children and a wife to support and large medical bills, he withdrew his entire pension fund. He also applied for and received unemployment insurance benefits. In anticipation of being able to work, in July of 1970 Mr. Dunbar filed numerous job applications and distributed his personal resumes to approximately 125 different employers. At that time, Dr. Slepian reported that he had fully recovered from the surgery and could return to work. Although Mr. Dunbar had several interviews, he was unable to secure a position in his field.

In April of 1971, the plaintiff's unemployment benefits ran out. Since his liquid assets had also been exhausted, he became eligible for and began receiving public assistance benefits. In July of 1971, Mr. Dunbar registered with the New York State Office of Vocational Rehabilitation. In conjunction with the office, he devised an educational plan that it was hoped would enable him to become a part-time teacher at Buffalo State College. However, in November of 1971, the Office withdrew its assistance because it determined that his physical condition was too poor to permit

the plan to be carried out and that he had no rehabilitative potential.

In the meantime, in October 1971, the New York State Bureau of Disability Determinations classified the plaintiff as permanently disabled. As a result, his public assistance was converted from the home relief category to the Aid to the Disabled category.

In December 1971, the Equitable Life Insurance Society certified Mr. Dunbar as disabled for the purpose of private insurance benefit entitlement, and set an onset date of March 13, 1970. At this time, the plaintiff accepted the fact that he was permanently disabled, and applied for social security disability benefits upon recommendation of the Office of Vocational Rehabilitation.

The plaintiff's application was denied in May of 1972 based on Dr. Slepian's report of a normal post-operative recovery. At that time, the SSA assumed that the plaintiff's claim of disability was based solely on the condition which had been treated surgically.

In January of 1974, the Aid to the Disabled program was supplanted by the Supplemental Security Income program [SSI], administered in New York by the federal government. The plaintiff, since he had been receiving benefits under the old disability program administered by the state, was automatically placed on SSI.

In February of 1974, the plaintiff requested reconsideration of the original determination by SSA of non-disability and simultaneously filed a second application. On June 8, 1974, the New York State Bureau of Disability Determination, which makes recommendations to SSA on applications for social security disability benefits, found that Mr. Dunbar was disabled by hypertrophic arthritis. However, pursuant to 42 U.S.C. § 421(c), SSA elected to reverse the state agency determination and requested that Mr. Dunbar be examined by a psychiatrist, Dr. Marshall, and an orthopedic surgeon, Dr. Tedesco.

Dr. Marshall examined the plaintiff and found no evidence of any psychological dis-

order. In addition to filing a report in the format requested by SSA, Dr. Marshall attached a letter outlining in strong language additional facts which he felt were "so compelling by their nature and intensity that they can no longer remain formally unattended." Dr. Marshall concluded that the plaintiff's frustration with the SSA in processing his claim was misinterpreted as possible psychiatric disturbance. Because the letter has a direct bearing on Mr. Dunbar's credibility, it will be quoted in depth below.

With the addition of the Marshall and Tedesco reports, the state agency again found that Mr. Dunbar was disabled. However, this recommendation was again reversed by SSA, apparently on the basis of a review of the medical evidence by a nonexamining SSA physician, Dr. Montgomery. The plaintiff then requested a hearing before an ALJ, and he appealed to this court from the adverse hearing decision.

Establishing entitlement to disability benefits is a two-step process. First, the applicant must show that he is suffering from a medically determinable physical or medical impairment which can be expected to result in death or last for a continuous period of twelve months. Second, this impairment must render the applicant unable to engage in any substantial gainful employment. 42 U.S.C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. § 404.1501(a)(1)(i). In this case, the ALJ found that Mr. Dunbar had a long history of varied musculoskeletal discomfort, involving primarily his neck, low back, left knee, and upper extremities. He concluded that the discomfort precluded heavy work but was not so severe as to prevent sedentary to light work, of the type he performed in his former jobs. In reaching this conclusion, the ALJ rejected the plaintiff's evidence of severe intractable pain.

■ In arguing that the ALJ's decision should be reversed, the plaintiff has undertaken an extensive review of the evidence presented to the ALJ and has suggested numerous errors that were made in weighing the evidence. In reviewing the ALJ's findings, the question is whether they were supported by substantial evidence. 42

U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Although the plaintiff's suggested interpretations of the evidence are plausible, I cannot say that the ALJ's analysis of the objective medical evidence was contrary to substantial evidence. I do, however, find that the ALJ erred in rejecting the plaintiff's subjective evidence of pain. These two conclusions shall be discussed in turn below.

■ The medical evidence firmly established a physical basis for a moderate degree of pain, but sharply conflicted on whether a clinical basis existed for severe intractable arthritic pain. Dr. Taylor's opinion, as the plaintiff's treating physician, was entitled to great weight. *Bastien v. Califano,* 572 F.2d 908, 912 (2d Cir. 1978). However, other physicians who examined the plaintiff and reported in detail on the objective medical data found no significant or totally disabling impairment. The plaintiff himself admits that the cause of his pain is not clearly discernable.

The plaintiff argues that the ALJ erred in relying on Dr. Montgomery's report because Dr. Montgomery never examined the plaintiff but only evaluated existing medical evidence. However, the ALJ did not identify any single factor or medical opinion as decisive in his decision. Even if Dr. Montgomery's report were excluded from the record, substantial evidence remains based on the reports of examining physicians to support the ALJ's conclusions.

■ On the issue of pain, the ALJ correctly stated that "[p]ain seems to be at the heart of claimant's arthritic complaints." (Decision at 14). However, he refused to give full weight to the plaintiff's testimony, and concluded that he failed to prove "severe intractable pain during the period in issue which precluded him from doing sedentary to light work." (Decision at 17).

It is well established that pain itself can be disabling under the Social Security Act:

Even pain unaccompanied by any objectively observable symptoms, which is nevertheless real to the sufferer and is so intense as to be disabling, will support a claim for disability benefits.

*Sayers v. Gardner,* 380 F.2d 940, 948 (6th Cir. 1967), *citing Ber v. Celebrezze,* 332 F.2d 293 (2d Cir. 1964). Although the record does contain medical opinions suggesting that the plaintiff's physical impairments were not so severe as to preclude him from performing light or sedentary work, they do not rule out the possibility that he was disabled by pain. *See Smith v. Richardson,* Civ–1972–121 (W.D.N.Y. May 28, 1975). I find that the record does not contain substantial evidence directly refuting the plaintiff's allegations of pain and his description of the discomfort he suffered.

The ALJ appears to have relied on several factors in concluding that the plaintiff's pain was not as severe as he claimed: failure of the physicians to find residual functional capacity commensurate with the pain, a report by Dr. Ardan which appeared to question the plaintiff's credibility, the plaintiff's appearance at the hearing, and various unspecified "contradictions and inconsistencies" in the record. None of these factors, either individually or in combination, constitutes substantial evidence of lack of credibility.

■ The residual functional capacity estimates deal with such objective findings as muscle strength, range of motion in the joints, and respiratory insufficiency. The limitations indicated with respect to walking and lifting are designed to convert a medical diagnosis into a form which may be the basis for a nonmedical opinion on suitable work. They do not purport to quantify pain, and therefore should not be used to discredit Mr. Dunbar's subjective testimony. Following *Ber v. Celebrezze, supra,* the Ninth Circuit stated the rule in *Mark v. Celebrezze,* 348 F.2d 289, 292 (9th Cir. 1965):

[T]he Secretary, under the guise of "medically determinable . . . impairment", [cannot] approach the determination of "disability" within the provisions of § 223(c)(2), from an exclusively technical viewpoint, thereby sacrificing realities of the individual case to rigid requirement of a preponderance of objec-

tive clinical findings. . . . On the contrary, it may be necessary, in ascertaining whether statutorily-defined "disability" exists in a given case, to determine the truthfulness of allegations of subjective pain . . . . [P]erformance of this duty cannot be avoided by facile reference to such medical evidence as deals singularly with objective symptoms demonstrable by laboratory analysis.

(Citations omitted).

The ALJ interpreted Mr. Ardan's report as questioning the plaintiff's credibility, because it cited such factors as discrepancies between his subjective complaints and his performance on functional capacity tests, voluntary freezing of the neck when asked to demonstrate neck motions, and the disappearance of his upper body tremors when the examination focused on other aspects of his condition. The ALJ also stated that he noticed no tremor in the plaintiff's upper extremities at the hearing and nothing unusual about his gait. However, the ALJ's decision places no greater emphasis on these factors than on other evidence in the record. Although some of this evidence bears on credibility, it is by no means substantial, and there is no assurance in the opinion that the ALJ considered it to be so.

The ALJ repeats on several occasions his unadorned assertion that various unspecified contradictions, ambiguities, and inconsistencies render the plaintiff unworthy of belief. At the same time, he accepts the consensus clinical evidence as proof of a physical impairment which, though not itself disabling, could at least partially explain the pain. It appears that the decision denying benefits was based on the ALJ's refusal to credit the only evidence which addressed the issue: the plaintiff's subjective testimony corroborated by his wife's testimony. Because the ALJ's decision does not articulate his reasons for questioning the plaintiff's credibility and does not indicate the amount of weight he gave to various items of evidence, it cannot stand. *Ber v. Celebrezze, supra* at 299; *Szumonski v. Weinberger,* 401 F.Supp. 1015, 1017–18 (E.D.Pa.1975).

The ALJ's decision not only failed to cite substantial evidence for rejecting Mr. Dunbar's allegations of pain, but it also failed to take into account or give reasons for rejecting evidence supporting his allegations.

Mr. Dunbar's work history and his efforts to find employment after his operation are inconsistent with the ALJ's implicit finding that he exaggerated the degree of his pain. Prior to 1970, the plaintiff had been steadily and gainfully employed as an engineer and a manager with highly reputable businesses and with the Pentagon. It is difficult to understand why a person with Mr. Dunbar's background and qualifications would accept the lifestyle described at the hearing unless he was actually suffering disabling pain.

Mr. Dunbar's actions are also inconsistent with any unwillingness to work. When he began experiencing prolonged, severe attacks, he continued to work for several years, even though to do so he had to set up a traction device at work. After his surgery, he made extensive efforts to obtain another job. When these efforts failed, he even designed an educational program which would enable him to teach college courses on a part-time basis.

Mr. Dunbar's condition has reduced him to poverty. In 1970, he held a very high position, both professionally and financially. Expecting to return to work, he withdrew his entire pension fund to meet current living expenses for himself and his family. He then was forced to sell his home and his other assets. Since April, 1971, he has been eligible for and receiving public assistance. Given his earning potential and his desire to work, his present financial status can only be explained if his testimony is believed.

The plaintiff's position draws additional support from the numerous disability determinations made by other agencies. Although these findings are not conclusive in determining whether an individual is disabled under the Social Security Act, they are entitled to some weight, and they bolster Mr. Dunbar's credibility. *Cutler v.*

*Weinberger,* 516 F.2d 1282, 1286 (2d Cir. 1975). The ALJ's decision, however, handled these determinations summarily. He also failed to point out that the state agency charged with making recommendations to SSA on disability applications on both occasions classified Mr. Dunbar as disabled, but that SSA, in an unusual exercise of its authority to review the state agency determination, reversed these findings.

Dr. Marshall's report provides additional support for Mr. Dunbar's credibility. Finding that his rage and impatience were indications of frustration with the application process rather than of psychiatric disturbance, Dr. Marshall stated:

Mr. Dunbar [must be seen] as a complete person, rather than a pettitioner [sic] on a standardized form. He is an intelligent, forceful, articulate and cooperative human being. His success in all pertinent areas of his life are testimony to well developed and intense personality. He has been a potent, effective person emotionally, intellectually and physically. Professionally he has completely and consumately [sic] discharged his numerous and important responsibilities. His [vitae] speaks for itself.

. . . His "rage" then is not a signal for psychiatric assistance but rather a beacon that illuminates a process that has, at least for this man, has [sic] become impotent and destructive.

If the above named patient does not qualify of Disability benefits based on the appropriate data, which honestly seems so remote as to be inconceivable then so be it. But for the sake of our own professional integrity let us evaluate him efficiently forthrightly and without distortion.

The ALJ erred in failing to give great weight to Dr. Marshall's report. As a trained psychiatrist, Dr. Marshall was in a particularly good position to evaluate Mr. Dunbar's credibility, and his judgment was well within his area of expertise. It is also important to note that Dr. Marshall was not selected by the plaintiff and therefore cannot be accused of any partiality. To the contrary, SSA referred Mr. Dunbar to Dr. Marshall when it misinterpreted Mr. Dunbar's frustration with the agency for a possible psychological disorder.

Although the ALJ accepted Dr. Marshall's finding of no mental impairment, he criticized a statement in the report about Mr. Dunbar's disability as outside the doctor's area of expertise and not supported by clinical evidence. This interpretation of Dr. Marshall's statements, however, was in error and reveals a failure to read the report in its entirety. Dr. Marshall, in stating that Mr. Dunbar is incapacitated by arthritis, was not making a medical finding but was rejecting the possibility that Mr. Dunbar's complaints of pain were exaggerated or fictitious. He also was explaining that his claim of disability was not, as SSA for a time believed, based on disc disease but rather on extensive arthritis.

One final point must be noted. The ALJ found that Mr. Dunbar's allegations of daily medication of twenty-five to forty pills a day "are not substantiated, e. g., by pharmacy bills for claimant's medication." Although the plaintiff is normally expected to supply the evidence of his alleged disability, in Mr. Dunbar's case the only comprehensive prescription list was in the hands of Medicaid, which would not release it to him. Since the ALJ could have subpoenaed this information on Mr. Dunbar's behalf (20 C.F.R. § 404.926), he should not have relied on any absence of substantiation of medication as evidence of lack of credibility. The ALJ has a duty to fully and fairly develop the facts. *Sellars v. HEW,* 458 F.2d 984, 986 (8th Cir. 1972); 20 C.F.R. § 404.927. The ALJ in this case failed to fulfill this duty.

Where there is additional evidence which can be produced to remedy defects in the original administrative proceedings, a social security case should be remanded to SSA for a new hearing. *Bastien v. Califano, supra* at 913. Where, however, a rehearing would simply delay receipt of benefits, reversal is appropriate. *Gold v. HEW,* 463 F.2d 38, 44 (2d Cir. 1972). Since the record in this case has been thor-

oughly developed, I can see no reason for authorizing the additional expense and delay of a new hearing. Mr. Dunbar applied for benefits in 1971, and it is now 1978. To delay resolution of this matter further would serve no useful purpose. Accordingly, I reverse the ALJ's decision and direct that disability benefits commence immediately.

So ordered.